# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| *In re Family Dollar Stores, Inc., Pest Infestation Litigation* | MDL No. 3032 |
| **This Document Relates To:** | Case No. 2:22-md-03032-SHL-TMP |
| **ALL CASES** | |

## DEFENDANTS' STATEMENT IN SUPPORT OF
## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT

Defendants respectfully submit this statement in support of Plaintiffs' Motion for Final Approval (Dkt. 198).[1] Plaintiffs' counsel's motion discusses each of the final approval factors required under Sixth Circuit precedent, demonstrating that the settlement is fair, reasonable, and adequate. *See Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631–32 (6th Cir. 2007). Family Dollar does not repeat those arguments here, and instead focuses on the following factors: (1) the significant risks that Plaintiffs and the class would face from further litigation absent settlement; (2) the positive response from class members to the proposed settlement; and (3) the company's remedial efforts, including its recent resolution with the U.S. Department of Justice. All of these factors weigh in favor of final approval of the class settlement.

Granting final approval of the proposed class settlement would resolve the entirety of this MDL and provide meaningful relief to settlement class members—particularly where there is no evidence of consumer harm. In particular, the settlement properly accounts for the substantial risks to Plaintiffs and the proposed class from further litigation. Moreover, the robust notice program approved by the Court has yielded 136,980 validated claims (subject to a final audit), which represents an approximate claims rate of **_13%_**, with very few opt-outs and no objections (other than the Arkansas Attorney General objection at the preliminary approval stage, which the Court rejected, *see* Dkt. 189). The class members' positive reaction to the proposed settlement confirms the generous nature of the relief provided and further supports final approval. Coupled with the company's extensive, voluntary remedial efforts, this settlement would fully resolve any

---

[1] The "Defendants" are Family Dollar Stores of Tennessee, LLC; Family Dollar Stores of Arkansas, LLC; Family Dollar Stores of Alabama, LLC; Family Dollar Stores of Louisiana, LLC; Family Dollar Stores of Mississippi, LLC; Family Dollar Stores of Missouri, LLC; Family Dollar Services, LLC; Family Dollar, LLC (formerly Family Dollar, Inc.); Family Dollar Stores, LLC (formerly Family Dollar Stores, Inc.); Dollar Tree, Inc.; and Dollar Tree Stores, Inc.

1

outstanding issues in connection with the claims brought here. The Court should grant final approval of the settlement.

I. THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE GIVEN THE SIGNIFICANT RISKS OF FURTHER LITIGATION

At its core, this lawsuit focuses on the conditions found in a regional Family Dollar distribution center. Family Dollar has acknowledged that those conditions were unacceptable and has taken significant measures to remedy and prevent such conditions from reoccurring in the future, but it is a leap too far to suggest that those conditions caused actual harm to any customer. Defendants took discovery in this matter and identified no evidence to suggest that any consumers were harmed by the conditions at the Distribution Center. Defendants moved to dismiss the operative complaint in its entirety, challenging numerous threshold deficiencies in Plaintiffs' claims, including the lack of Article III standing and injury, and that motion remained pending at the time of settlement. Dkt. 164 at 1–2. Given these significant challenges, it was not even clear that Plaintiffs' claims would have withstood dismissal on the pleadings.

In addition to these threshold legal challenges, Plaintiffs would have faced significant obstacles to class certification. Their claims implicate a variety of individualized analyses that were highly likely to overwhelm any alleged "common" issues—including individualized assessments of materiality, injury, causation, and damages. Dkt. 164 at 2. The diverse class of consumers across six states purchased and used different products from different stores, at different times, during the proposed class period (during which the alleged issues at the Distribution Center varied substantially), and had differing knowledge regarding the potential presence of rodents. *Id.* These (and other) variations very likely would have presented insurmountable challenges to class certification outside of the settlement context. While these issues did not prevent the certification of a class action for settlement purposes only, based on the evidence available at the time of

2

settlement, they likely would have presented intractable management issues with respect to any trial in a putative class action. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. P. 23(b)(3)(D), for the proposal is that there be no trial."). There also would have been significant challenges to proving their claims on the merits. After extensive discovery, including requests asking Plaintiffs to identify evidence of harm, Defendants received no such evidence in this case. Family Dollar took the depositions of several named Plaintiffs, and not a single one testified that they experienced, or were diagnosed with, any of the potential illnesses referenced in the complaint (although a few complained about seemingly unrelated illnesses). Most admitted that they used and enjoyed the Family Dollar products they purchased without incident and had "never heard of" most of the illnesses potentially carried by rodents. Graves Depo. Tr. at 125:1–18 Bibbs Depo. Tr. at 141:3–13, 142:1–3; Lacy Depo. Tr. at 115:2–10, 115:23–24. None of the Plaintiffs were able to identify specific instances of harm or injury tied to specific products originating from the Distribution Center, much less tie any such instances to the presence of rodents, and several expressly acknowledged that they suffered no harm:

- Plaintiff Graves testified that neither he nor his wife experienced any illnesses or symptoms of illnesses as a result of "any of this." Graves Depo. Tr. at 92:19–22.

- Others similarly acknowledged that they never got sick from using Family Dollar products. Lacy Depo. Tr. at 111:15–18; Bishop Depo. Tr. 75:6–15; Bibbs Depo. Tr. at 105:6–16.

- One plaintiff even admitted that it "would be difficult to track whether a person got sick as a result of" using products from the Distribution Center. Whitney Depo. Tr. at 149:4–22.

Every Plaintiff who offered testimony and regularly shopped at a Family Dollar store before the recall, moreover, continued to shop there even after learning about the presence of rodents in the

3

Distribution Center. For instance, one plaintiff continued to purchase and consume products from Family Dollar despite being long aware of the rodent activity at the facility because her husband was employed there. Smith Depo. Tr. at 56:6–17, 59:18–24, 159:13–23. Another used products that he purchased before the recall after he learned about the recall. Whitney Depo. Tr. at 36:11–15. One plaintiff claimed that she saw live rodents in a Family Dollar store, but she continued to shop there. Lacy Depo. Tr. at 61:12–21. And none testified that his or her products failed to perform as intended.

In sum, the "complexity, expense, and likely duration of the litigation" absent settlement and Plaintiffs' low "likelihood of success on the merits" as compared to the generous "amount and form of the relief offered in the settlement" support final approval. *Gen. Motors*, 497 F.3d at 631. As this Court acknowledged in its order granting preliminary approval, the settlement allows the class to avoid these significant risks of further litigation. Dkt. 189 at 22.

## II. THE CLASS' HIGH RESPONSE RATE FURTHER SUPPORTS FINAL APPROVAL

Another key factor that courts consider when determining whether to grant final approval of a class settlement is the reaction of the class members. *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, 2017 WL 3124105, at *3 (E.D. Tenn. May 26, 2017). That factor weighs heavily in support of final approval here.

Family Dollar estimates that there are approximately 1,052,104 households comprised of individuals who may have shopped at Family Dollar stores serviced by the West Memphis Distribution Center. Angeion Group LLC (the court-appointed settlement administrator) oversaw the settlement process, including disseminating notice to this group. The Court-approved notice plan included: (i) direct email notice; (ii) internet and social media notice; (iii) publication notice; and (iv) notice via an established a settlement website (https://fdwarehousesettlement.com), and

4

was reasonably calculated to reach no less than 80% of the settlement class. *See* Dkt. 199 (Weisbrot Decl. ¶¶ 7, 11, 14, 15). On November 10, 2023, the administrator successfully delivered e-mail notice to 444,382 potential class members. *Id.* ¶ 9. The parties then agreed to send a *second* reminder email to potential class members. So on January 5, 2024, the administrator successfully delivered a "Reminder Notice" to 440,611 potential Class Member records whose initial Email Notice was deliverable and who had not already submitted a Claim Form. *Id.* ¶ 10. In addition to the two email notices, Angeion estimates that the media notice reached approximately 81% of the class an average of 5.91 times through more than 25 million impressions. *Id.* ¶ 12. Even beyond the publication notice plan, the settlement received significant media attention, reaching additional potential class members. In other words, class members received ample notice and opportunity to submit claims if they desired to do so.

Angeion already approved and disapproved claims, although it needs to complete its final audit. There were a number of claims that were facially invalid—for example, claims made by individuals who lived outside of one of the six states. Angeion also determined that there were a significant number of fraudulent claims, which, unfortunately, is becoming increasingly common in these types of "claims-made" consumer class action settlements. Commentators have observed that this is a growing problem,[2] but fortunately Angeion was able to detect and reject these fraudulent claims.

There were a grand total of 989,917 claims submitted, with 752,643 determined to be fraudulent. The high number of fraudulent claims does not provide a reason to reject the settlement. There has been a significant rise in fraudulent claims in consumer class settlements in recent

---

[2] *See generally* Ross Weiner, *The Increasing Danger of Fraudulent Claims in Class Action Settlements*, NEW YORK LAW JOURNAL, July 26, 2023, https://www.law.com/newyorklawjournal/2023/07/26/the-increasing-danger-of-fraudulent-claims-in-class-action-settlements/

5

months, with more sophisticated criminal actors using technology, including bots, to submit large numbers of claims and evade fraud detection efforts.[3] And this case is no exception. The settlement set a relatively low bar to submit a claim—a settlement class member only needed to reside in one of the six states with Family Dollar stores serviced by the West Memphis Distribution Center, identify one of those stores where he/she shopped, and attest that between January 1, 2020, and February 18, 2022, he/she purchased a product from the store identified—without providing any additional proof of purchase. Dkt. 181-1, Ex. E. (As noted below, the parties also agreed to process claims that included store information from *any* store within the six states.)

Although this streamlined claims process made the settlement a target for bad actors, the parties retained Angeion—one of the leading claims administrators—which was able to identify, disqualify, and combat fraudulent claims through the use of sophisticated tools. Counsel for both parties have worked closely with Angeion and other administrators in this case (and others) to ensure that only legitimate, valid claims are approved. In this case, Angeion deployed a sophisticated and proprietary real-time fraud detection system (AngeionAffirm) that automatically reviews and flags potentially fraudulent claim form submissions by employing (1) AI-based script identifications to identify bot and scripted browser traffic; (2) behavior analysis to identify abnormal patterns that could infiltrate fraudulent submissions; (3) advanced email verification; (4) robust IP monitoring; (5) historical data analysis; and (6) multiple security measures and defenses. *See* Angeion Group, *Angeion Group Introduces First of Its Kind Real-Time Fraud Detection System*, PR Newswire, Oct. 2, 2023, https://www.prnewswire.com/news-releases/

---

[3] *See* https://www.sidley.com/en/insights/publications/2023/08/beware-of-bots-and-ai-minimizing-the-risk-of-fraudulent-claims-in-class-action-settlements (describing how a "bot" hijacked thousands of claims in class action settlement).

angeion-group-introduces-first-of-its-kind-real-time-fraud-detection-system-301946263.html. Through this system and additional analysis, Angeion identified 752,643 claims as fraudulent.

It is widely accepted that courts "can rely, as they have for decades, on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to take into account the size of the claims, the cost of the techniques, and an empirical assessment of the likelihood of fraud or inaccuracy." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 667 (7th Cir. 2015). It is both necessary and appropriate to exclude these claims to ensure that only valid claims are paid, and courts regularly approve settlements under similar circumstances. *See, e.g.*, *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, 573 F. App'x 178, 180 (3d Cir. 2014) (noting that an approved settlement was "inundated with fraudulent claims").

As the Court is aware, the settlement expressly required claimants to attest that no other member of the same household previously submitted a claim form, and that they shopped at a store serviced by the West Memphis Distribution Center. Dkt. 181-1, Ex. E. After reviewing the claims information, the parties conferred to address concerns that some class members with legitimate claims may have inadvertently provided incorrect or incomplete store information. To address this potential issue, the parties recommend that the Court approve claims made by individuals who reside within Alabama, Arkansas, Louisiana, Missouri, Mississippi, and Tennessee and who provided information indicating that they shopped at a Family Dollar store within those six states (whether or not that store was actually serviced by the Distribution Center). The parties further recommend that the approved claims should exclude direct duplicate claims (i.e., instances of one claimant submitting multiple claims), but also to permit claims made by separate claimants within the same household (e.g., roommates each submitting a separate claim). If the Court were to accept

7

this recommendation, allowing these claims would resolve the Arkansas Attorney General's concern that claimants "may or may not know if their application for restitution will be rejected on the basis that someone else at that address . . . has already submitted a claim." Dkt. 183 at 14. The Court already overruled the Arkansas Attorney General's objections to the settlement at the preliminary approval stage (*see* Dkt. 189), and the office has not objected to final approval.

These validated, de-duplicated, and non-fraudulent claims total 136,980, representing a claims rate of 13%.[4] This total would be an extremely high response rate in a consumer class action, particularly a case like this one that involves no proof of actual consumer harm. Courts have approved settlements with lower (often single-digit) claims rates. *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (citing evidence suggesting that "consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns"); *see also Pollard v. Remington Arms Co.*, 320 F.R.D. 198, 214–15 (8th Cir. 2017) (same); Alison Frankel, *FTC's comprehensive study finds median consumer class action claims rate is 9%*, Reuters, Sept. 10, 2019, https://www.reuters.com/article/idUSKCN1VV2QT (reporting the FTC's study of consumer class actions: "The median claims rate in these cases is 9%. The weighted mean claims rate, which takes into account the number of class members who received settlement notifications, is 4%.").

In addition to a very robust claims rate, the settlement also had *zero* objectors and *only 25* valid opt-outs (a mere fraction of 1% of the certified class) (Dkt. 199 (Weisbrot Decl. ¶¶ 22, 23)). *See Keil v. Lopez*, 862 F.3d 685, 698 (8th Cir. 2017) ("[O]ut of a class of approximately 3.5 million households, . . . only fourteen class members submitted timely objections[,] [and] none of the

---

[4] The total number of claims paid may vary slightly based on the results of Angeion's final audit.

8

named plaintiffs objected to the settlement. Thus, the amount of opposition is miniscule when compared with other settlements that we have approved.").[5]

This positive reaction of the class to the proposed settlement, including the lack of objections, provides a "strong indication of fairness" and weighs in favor of final approval. *See Does 1, 2 & 3 v. Coliseum Bar & Grill, Inc.*, 2020 WL 7346693, at *1 (E.D. Mich. Oct. 22, 2020) ("The fact that the vast majority of class members neither objected nor opted out is a strong indication of fairness.") (internal quotations and citation omitted).

### III.  THIS SETTLEMENT IS A CORE PART OF FAMILY DOLLAR'S EFFORTS TO PUT THIS MATTER BEHIND IT

Even before Plaintiffs filed this lawsuit, Family Dollar cooperated fully and voluntarily with the Food and Drug Administration (FDA). The company instituted a voluntary recall, which included products the FDA indicated were suitable for use and consumption. Family Dollar also offered a full refund to consumers without any proof of purchase and regardless of when they made their purchase. At least one named plaintiff took advantage of this offer, receiving refunds for several items he had purchased. Whitney Depo. Tr. at 134:17–21, 139:25–140:5.

The company has only continued these efforts throughout the course of this litigation. As this Court acknowledged in its order granting preliminary approval, Family Dollar undertook extensive remediation efforts to "prevent issues like those alleged to have occurred at Distribution Center 202 from occurring again." Dkt. 189 at 2. Among other steps, Family Dollar: (1) retained a number of third-party consultants with expertise in food safety and regulatory compliance; (2) implemented more than *sixty* Standard Operating Procedures addressing topics including

---

[5] Angeion received another 41 purported opt-outs from people who are not part of the settlement class (either because they resided in another state or otherwise did not make a purchase at an affected Family Dollar store).

(among others) integrated pest management, sanitation, employee training, food safety, and preventative maintenance; (3) created a large food safety department; and (4) significantly enhanced the compliance systems and processes throughout the company.

Most recently, Family Dollar announced a settlement with the Department of Justice. *See* Dollar Tree, Inc., *Family Dollar Stores, LLC, and U.S. Department of Justice Resolve Investigation into Operations at Family Dollar's Distribution Center in Arkansas*, Feb. 26, 2024, https://corporate.dollartree.com/news-media/press-releases/detail/261/family-dollar-stores-llc-and-u-s-department-of-justice.  As part of this settlement, Family Dollar Stores, LLC agreed to plead guilty to a one-count misdemeanor violation of 21 U.S.C. §§ 331(k), 333(a)(1), a strict liability statute that prohibits acts that cause articles of food, cosmetics, drugs, and devices to become adulterated while such articles were held in the Distribution Center after shipment in interstate commerce.  As part of this plea agreement, and consistent with its commitment to take remedial steps to prevent a reoccurrence of the conditions at the West Memphis Distribution Center, Family Dollar agreed to enhance its compliance program, including by implementing policies and procedures to address potential risks under the Federal Food, Drug and Cosmetic Act (21 U.S.C. §§ 331(k), 333(a)(1) *et seq*.).  These steps will only further strengthen the company's regulatory controls.

The plea agreement does not negate the risks of further litigation to Plaintiffs.  Notably, it does not identify, or require, evidence of consumer harm.  Rather, the agreement turns on the existence of adulterated products in the Distribution Center regardless of whether such products reached consumers, much less caused any actual consumer injury.  As explained above, there was no such evidence of consumer harm in this case.

With the resolution of the DOJ investigation, and approval of this class settlement, all that

10

will remain is the Arkansas Attorney General litigation, and the company has moved to dismiss that lawsuit on the pleadings.  *See* Defendants' Motion to Dismiss, *State of Arkansas v. Family Dollar Stores, Inc., et al.*, 60CV-22-2725 (Ark. Cir. Ct., Pulaski County).

Family Dollar respectfully requests that the Court grant final approval of the settlement.

Dated:  March 1, 2024

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ *Christopher Chorba*
    Christopher Chorba
    GIBSON, DUNN & CRUTCHER LLP
    333 South Grand Avenue
    Los Angeles, CA  90071
    Email: CChorba@gibsondunn.com
    Telephone: 213-229-7000

    Jason R. Meltzer
    Jesenka Mrdjenovic
    GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, N.W.
    Washington, D.C. 20036
    Email:  JMeltzer@gibsondunn.com
    Email: JMrdjenovic@gibsondunn.com
    Telephone: 202-955-8500

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 1, 2024, I electronically filed the above with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

                                        */s/ Christopher Chorba*
                                        Christopher Chorba